Good morning, your honors. May it please the court, my name is Bradley Wood and I represent the 11 defendants in this case, the appellants who consist of Sheriff Tracy Carter, the Sheriff of Lee County, North Carolina, and 10 of his deputies. Your honors, the main issue before the court today is whether each of these individual defendants, under the circumstances that they each faced and reasonably perceived, each of them is entitled to qualified immunity. And moreover, whether five of these appellants are also entitled to public officer's immunity under North Carolina law with respect to state law tort claims of assault and battery. As this court knows, law enforcement officers are entitled to qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful. Qualified immunity protects law enforcement officers from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines. And as this court knows, because circumstances that are tense, uncertain, and rapidly evolving, the facts must be evaluated from the perspective of a reasonable officer on the scene and the use of hindsight must be avoided. More reasonableness is determined based upon the information possessed by the officer at the moment that the force is employed. Taking the plaintiff's version of the facts, your honors, and you filter the plaintiff's version of the facts through the reasonable qualified immunity and those who are facing state law tort claims are also entitled to public officer's immunity under North Carolina law. On April 27, 2009, Deputy Justin Matthews was patrolling alone in his assigned area of Lee County, North Carolina when he responded to a call regarding two white males damaging property. When he arrived at the scene, he found two large white males, the plaintiff Now, Thomas was six feet tall and weighed 218 pounds, and his friend Josh Gross was between 6'2 and 6'3 in height and weighed between, by his own estimations, 290 to 300 pounds. Matthews opened the door to his patrol car, stepped out, and according to Gross, said words to the effect of, what's going on, fellows? According to Thomas's testimony, he immediately approached Deputy Matthews. Coming within two feet of Matthews while Matthews was cornered between his open driver's door to his rear and side and his patrol car to his left. According to Mr. Thomas, he approached Matthews with his hands raised in front of his face and palms outward. And according to Mr. Thomas, he got close enough to Matthews where he could reach out and touch Matthews in an instant. And according to Mr. Thomas, he also told Matthews, sir, I have lost my mind. Mr. Thomas testified the purpose that he wanted to or the information he wanted to convey was that he was mentally disturbed. According to Mr. Thomas and Mr. Gross, Mr. Gross told Deputy Matthews that my friend needs some help. There is something wrong with him. And the plaintiff's law enforcement expert confirmed that a reasonable officer hearing these words would be reasonable in concluding that the subject was a mental case, which presents additional threat concerns due to the unpredictable nature of mental subjects. Now, Mr. Thomas contends that on that day and at that time, he was suffering from a condition known as colon esterase inhibition, resulting from his exposure to farm chemicals. He engaged two scientific experts to talk about this condition, and they both agreed that this condition is characterized by profuse sweating, and I'm quoting from their opinion, profuse sweating, blurred vision, tearing, agitation, cognitive impairment, memory lapses, and activation of the pathways in the brain that lead to fear, anxiety, rage, and belligerent behavior. One of the doctors, Dr. Slotkin, noted that the individuals who experience this condition can be involved in violence with other people, and in his expert opinion, he referred to studies that involved homicides involving stabbing and bludgeoning people to death by persons under this condition. And this is the nature of the person that Deputy Matthews was encountering that day. It's undisputed that Deputy Matthews commanded Thomas to step back away from him and that And according to Thomas, Matthews told him, and I apologize to the court for the profanity, told him to get the fuck back. And according to Thomas, he fully understood that the deputy wanted him to stay back. Now, the plaintiff's law enforcement expert further testified that officers are trained to maintain a zone of separation, sometimes called a reactionary gap, of at least five or six feet at a bare minimum in order to give an officer time to react in the event of a sudden assault. And he confirmed that without this reactionary gap, a subject can grab the officer, strike the officer, or disarm the officer before the officer can react. Now, despite knowing that the deputy wanted him to stay back, Thomas admits that he confronted Matthews again, again coming inside of arm's length of Matthews where he could reach out and touch him and grab him again without any warning. Matthews again, according to Thomas, extended his arm a second time to push Mr. Thomas back and told him to stay back. After being pushed away a second time and told, this time according to Thomas, to get the fuck away from me. And again, I apologize for the profanity. Mr. Thomas, by his own testimony, remained within five to six feet in front of the deputy facing him, still inside the bare minimum of the reactionary zone that Mr. Thomas's own experts say that officers are trained and encouraged to maintain. Third party witnesses at the scene, including Linda Schmidt and Jimmy Martin, who lived in that area and saw this, confirmed that Mr. Thomas stayed right in the deputy's face. Matthews reasonably perceived that Thomas was not obeying his instructions to stay back and that he presented a threat by continuing to remain in close proximity to him. And in fact, Matthews testified that I felt threatened by the fact that he kept getting in my face and confining me into that such small area. Accordingly, Matthews drew his taser and according to Thomas, pointed at Thomas and repeatedly instructed Thomas to get down on the ground. Not only did Thomas hear the deputy instruct him to get down on the ground, but his friend, Josh Gross, also repeatedly exhorted Thomas to get down on the ground as the deputy was commanding him to do or that he would be tased. Mr. Thomas testified that despite understanding these instructions from both the deputy and his own friend, he refused to follow Matthews' lawful commands to get down on the ground. Thomas testified that he perceived that the deputy was scared and that the situation was escalating, but he still acknowledges that he did not get down on the ground as Deputy Matthews commanded him. Instead, according to Thomas' testimony, he backed away no more than one or two feet from where he'd been at five to six feet to six or seven feet away from the deputy while still facing him. And according to Thomas... I thought there was some evidence that he was turning to his right. And I'll get to that, Your Honor. Yes, ma'am. And then Thomas says, as I turned or as I backed, I turned to my right and as I turned, that's when he tased me. And Thomas said as he turned, he still was looking at the deputy and was able to see the prongs from his taser come out of the taser and strike him in the left shoulder. That's Thomas' testimony. Gross, his friend, testified that Thomas... These are quotes. Thomas turns to his right a little bit. I don't know if he was going to run or what he was going to do, but he turned away from the deputy and he got shot with a taser. Your Honors, at that moment, Matthews was faced with tense, uncertain and rapidly evolving circumstances. And a reasonable officer in that instant, in that split second, could have reasonably perceived that he was of the taser to protect himself. Is the taser have a line connected to the taser, the gun? The way that it operates, Your Honor, in prong mode, it has two prongs that are darts that come out of the device that then fasten themselves to the subject. And that's how the electrical power is applied. There's, as you'll see later on in the incident... The first firing is just to get the connection. That's right. And then, is there a separate function then to turn on some electricity or does it automatically happen? It will automatically happen, Your Honor, the first time. And then after that, now that the connection is established, then the deputy or the officer can apply additional five-second applications of electricity by pulling the trigger. Gross testified, as I just said, that he didn't know what Thomas was going to do at that moment. And Matthews can't be held to be any more telepathic than Gross. As this Court knows, the Fourth Amendment does not require omniscience. An officer does not need to be absolutely sure of the nature of the threat or the suspect's intent to cause him harm. The Constitution does not require certitude to proceed the act of self-preservation. And even if Matthews was mistaken as to whether Thomas was going to attack him, such a mistake would not be a violation of Thomas' constitutional rights, as it's well settled that mistaken but reasonable decisions do not transgress constitutional bounds. Because if Matthews had paused even for an instant, he risked losing the last chance that he had to protect himself from attack from Thomas. Now after Thomas was tased, he went down to the ground. According to him, he went to his back. Matthews reported in with his lapel mic that he had used his taser and that he needed backup. He also commanded Thomas to stay down on the ground. Thomas does not dispute that. In fact, his friend Josh Gross confirms that the deputy repeatedly commanded Thomas to stay down on the ground. But that's not what Thomas did. He rolled over from his back, got to his hands and his knees, and according to his own testimony, his intent was to stand up, was to get up, and to run away. But all that Matthews could see was this person is not obeying my commands. He's getting up. He poses an additional renewed threat to me. And Matthews made an additional decision in that split second, evolving circumstances, to apply a second charge to his taser and the means that I just described to Your Honor. Again Thomas goes down to his back, onto his back. Matthews again reiterates the commands to stay down on the ground. Stay down on the ground. Again, Thomas' friend confirms that these commands were given and Thomas does not dispute them himself. Again though, he tries to get back to his feet. He admits so in his brief and in his testimony. He gets to his hands and his knees again with the intent of getting up. Matthews again perceives a threat. He applies a third charge to his taser and Thomas admits that at that moment he grabbed the taser wires, ripped them apart, and stood up. And the purpose of doing this was to disable the taser. According to Thomas at this moment, Matthews sprayed him with pepper spray and it's undisputed that pepper spray had no effect on Thomas whatsoever. Instead he turned around and ran approximately 100 yards into a vacant lot across the road. And there's testimony from third party witnesses that as he crossed the bar, that he stumbled and fell face first without breaking his fall. Matthews after doing, reported in that he had, that the taser had been disabled, that the subject had disabled his taser and that he was in pursuit and he gave chase. And in the light most favorable to the plaintiff, as he was chasing Thomas, Thomas turned right back around, came right back at him as if he was shot out of a gun according to Gross. According to Thomas, the plaintiff's friend Josh Gross tackled Thomas to the ground and the two of them in the light most favorable to Thomas, Gross and Matthews attempted to handcuff Thomas but they weren't able to do so. Were only able to get one handcuff onto his wrist. And at that time additional deputies began to show up. Deputy Gilstrap arrived and when he arrived he already knew that Matthews was involved in an altercation, that he'd used his taser, that the subject had broken the taser wires and when he got there he saw the altercation between Matthews and Thomas. And a third party witness at the scene, who has no dog in the fight, said that he saw Gilstrap get out of his car at a time when Matthews and Thomas were struggling on the ground, that he pulled his, that Gilstrap pulled his taser out of his holster, hit Thomas with it and reported in and said, I had used my taser. This man observed that Matthews wasn't on top of Thomas at the time but that he was wrestling with him but not on top of him. That Thomas was at a point where he could be tased. This man said after... But what does the record show as to whether Thomas was handcuffed at this point? It's undisputed he was not handcuffed at this point. In the light most favorable to Thomas he had one handcuff on one wrist. And I would respectfully say that's like being a little bit pregnant. Either you're handcuffed or you're not. And so he's still a threat, he's not secured. And he was partially but not completely restrained? I wouldn't even go that far, Your Honor, because one handcuff, really the handcuff now becomes a weapon if they're able to get loose and flare with it. So unless the two wrists are restrained then you would be with no handcuffs on either wrist. It's undisputed that Gilstrap applied three applications of his taser and that Thomas did not obey his instructions to stay down on the ground and that Thomas continued to resist. It's undisputed that Gilstrap went to help Matthews try to get control over Thomas and they were unable to do that. At this point in time another deputy, Babb, arrives. He sees and he knows that tasers have been used by the radio traffic and he sees the two officers unable to get control over Matthew, over Thomas, despite the use of tasers and despite two of them. And in the light most favorable to Thomas, he punched Thomas either up to five times either in the back of the head or somewhere in the facial area in an attempt to stun him. And let me interrupt here, Mr. Wood. This is what really bothers me about this case, is Estes and Babb. It really appears when you look at the evidence in the light most favorable to the plaintiff that these were gratuitous and violent acts that were not necessary. I mean, I understand what the other officers were doing. They were threatened. They had a suspect. But I mean, to inflict this kind of physical punishment on someone's face, when they're down on the ground, you have the officers sitting on his rear end, to me, you know, it's appalling. And, you know, I don't see how you make a case for those two officers at all without that being a jury question. Well, I respectfully disagree, Your Honor. And I hear some of the, I know this court has issued the Meyer case earlier in February, and I think this case is distinguishable for that because in that case, it's undisputed that the subject was not resisting. But in this case, you have as many as five officers at the end trying to physically get control over this man. And you're saying it's okay to punch the person in the face repeatedly and to knee them in the face? I am saying, Your Honor, that if other efforts have not been successful, he's been tasered numerous times, and that hasn't worked. He's even gotten up off the ground and ripped the taser wires away. This isn't somebody who's murdered somebody. This is somebody who is claimed to have, alleged to have destroyed property. And you're saying that justifies repeated punchings in the face while he's down and after he's been tackled? I would say, Your Honor, at this point in time, the subject, regardless of what's happened earlier with respect to the property, again, the court must look at the use of the force at that moment in time and not what's gone on prior to that. But I would say that at this point, the deputies know that five of them aren't strong enough to apprehend this guy with brute force. They've used tasers numerous times, both in prong mode and in drive-stun mode. They've used pressure point techniques, and that hasn't worked. Pepper spray has been used. That hasn't worked. They really don't have any other option. Their goal at that point in time is to subdue the subject as quickly as possible and to get him restrained, both for his safety and the officer's. And I would respectfully submit that while, you know, it'd be nice to not have to resort to that level if other levels worked, those other levels weren't working and they applied this force in this case. Nobody hit him with a baton. And there's really no evidence that the jaw fracture, the only injury that he has from this whole incident, was inflicted either by one of those officers. And so I would respectfully submit that despite the punches and the kicks, all the officers in this case acted reasonably under the circumstances and they acted in conformance with the law enforcement officers, both in the Karakoff case as well as the Wilson v. Flynn case, in trying to restrain someone who was resisting and couldn't be restrained by previous means. And I see them far beyond my time and I reserve some time. Mr. Lewis. Good morning. May it please the Court. My name's Hardy Lewis. I have never had to use reading glasses before in an argument, and so I'm going to go back and forth and it's no apology is needed. It comes with age. Your Honor, I believe the last time I was in this courtroom was actually arguing Roland v. Perry, and I was in my 20s at the time and did not need reading glasses. I think that this case has a lot, I think that Roland v. Perry speaks in great degree to this case because in Roland v. Perry, the Fourth Circuit said in response to the arguments of the defense that each escalation of force was justified by the increasing amount of resistance from my client at the time, that they're missing the forest for the trees and that Tennessee v. Garner teaches us that we are supposed to look at the entirety of the situation and Well, why don't you start with the actions of the defendants, Babb and Estes? Well, to start with them, I guess one thing I would say is I'd like to quote from the record and this is the Lee County Sheriff's Office use of force policy and it says, deputies shall not deliberately strike another person on the head, spinal column, groin, solar plexus, kidneys or throat with any issued or authorized equipment or other object unless the deputy reasonably believes that his life or the life of a third party is threatened. The evidence in this record is undisputed. The positions of all of the officers say that none of them at any time were in any fear. Let me ask you, are the officers at that point entitled to handcuff them? Your Honor, I believe that they are, even though he is not entitled to arrest him for a lot of problems, resisting arrest and assaulting an officer, basically. Your Honor, it grew, but there were orders given to him by official police officers and he disobeyed them and the officer perceived that he was being approached and threatened, which is an assault. He was told to do various things. They wanted to handcuff him, which is an arrest. And the question is, can they affect the arrest once they've determined they've got to put the handcuffs on him? Are they entitled to go through and get that done or do they have to abandon that? Well, Your Honor, first of all, I would say that in the light most favorable to the plaintiff... You can put them in handcuffs and you agree they are entitled to do that. Do they have to abandon it? They were unsuccessful. They had one mission, to get the handcuffs on, and they couldn't get them on. And they had several officers trying to get them on and they couldn't get them on. They tasered them and they peppered them and officers hit them and they tried to hold them down and they were unsuccessful. Now, the question is, what is the officer's course? This is all fast moving. What is the course to get the handcuffs on if they're entitled to get them on? Your Honor, and I would respond by saying that if a jury finds that that is what they did... We're talking about hypotheticals, if you want. Do the officers have to abandon their right to put a man in cuffs? The officers do not have to abandon their right to put a man in handcuffs. What steps should have been taken? Well, Your Honor, I think that use of taser as a first resort, the use of the taser, certainly is questionable. I think that in this case... Well, I'm talking about this guy's... We're getting to this point where Judge Hamilton asked you about when the two officers came in and hit him. At this point, the man's on the ground. He's resisting. He's a very strong man. He's a very big man. They don't have to cuff him. And it seems to me it's undisputable that officers are entitled to handcuff somebody in a circumstance. The question is they can't accomplish it. Now, what do they do? Your Honor, under that set of facts... They have a man that's getting madder and madder and angrier and angrier, and do you just let a man like that go? Is that the proper policy? Well, Your Honor, no. I believe that they are entitled... That suggests they have to let him go. I think they're entitled, in their mind, to bring him into control. And whatever it takes to get him into control. Now, the question is how far does that go? That's not a well-defined question. In the Myers case, we had somebody who was no longer resisting, and that's often the case. And then there's punishment. But these guys are still trying to get him under control. And my question is, we're now going to go in hindsight and say these guys are personally liable for his injuries because they were making this effort, frustrated, completely frustrated, to get him cuffed. And, Your Honor, I understand your concern. Again, I would point to aspects of the record that suggest that perhaps it was not quite as difficult a task as they have made it out to be, and that is... Because they tried. Two of them couldn't do it. And either they were incompetent or they weren't strong enough. But it took more officers to do it. And the question, I suspect, is what else motive? Do you attribute deliberateness on their part? That they deliberately left the cuffs off in order to be able to punish him? Well, Your Honor... That's not in the record. I would point to the observations of Mr. Shearer, who was a bystander at the case, who said that at the time that Detective Babb administered the repeated punches to the face when his head was against the ground, that the officers were merely sitting on him, that there was not a struggle. And again, there has not been any evidence in this record that Mr. Thomas was violent toward any officer. But at the time that Detective Babb... You know that. I mean, that really is taking the position of angels. The idea that this man is uncontrollable, apparently mad, he's something mentally wrong with him, he's strong, he's resisting physically, he will not obey an order, he comes charging at you. I mean, to suggest that they don't have a right to bring him under control. And your suggestion that they had him under control is not borne out by the record. I don't think they ever had him under control until they had him cuffed. And everybody stopped then. Well, Your Honor, I would also add to the factors here that of the eight minutes that it took for this to occur, for at least 50 seconds of those minutes, my client had 1,200 volts at 19 pulses per second running through his body. And so... Give me some alternatives. The officers have to bring him under control. It's a bad situation. Maybe they could administer some Valium or something like that. They didn't have that there. They tried to use the pepper spray. That's what they had. They had the tasers, which are basically intended to slow somebody down like that. And he ripped it out and they put a bunch more in. He didn't respond to that. He didn't respond to commands. In a situation like this, though, Your Honor, is the progression here to the point that they are entitled to use deadly force? No, no, no. Not deadly force. We're talking about bringing somebody under control who's out of control. And the question is, the officers physically aren't strong enough to do it just with mechanical means. And that's what they tried to do. Now, an officer comes and hits him in the head trying to knock him down. That may not be the best choice. But are we now going to go back in hindsight and say that officer's house and his estate is going to be subjected to a judgment because he went to work that day and had this effort of bringing this man under control? The immunity is given up or forfeited when somebody deliberately violates a law that he knows is the law. Is there evidence that these officers knew that they were violating the law when they were doing this and trying to bring them under control? Your Honor, I would suggest that yes. And I would suggest not just because it's perhaps, although the case law says we can look to North Carolina Supreme Court, to Fourth Circuit, to U.S. Supreme Court. But we know that that can be artificial because we know that police officers do not, that police officers do not read the cases with all respect. They don't read the cases. No, we think it's a reasonable officer. But we have found that officers even using deadly force in situations, shooting a gun at somebody, has been okay. The problem is every case has to be decided on the back of that case. And you have to figure out, was the officer facing a situation where he knew he was crossing the line and carrying out his duties? And, Your Honor, I would again point to the Lee County Sheriff's regulations that expressly prescribe. They're trying to get the guy under control. But he is, these two are in violation of regulations that they've been trained to follow. And so in answer to your question, I would say that yes, they know that what they are doing, given that nobody is contending that this man on the ground, struggling for whatever reason, perhaps because he's been tased ten times, nobody is contending that he's a dangerous man, and yet they use force against his head. But we started off with the notion that's, to me, a wrong issue. This is not a punishment being effected for a crime. This is an effort by officers legitimately trying to arrest him. And he's resisting arrest with all his force. And they can't accomplish it. Now, whatever the background is, I mean, he could have just been drinking, or whatever, driving a car and drinking. That isn't the measure. The measure is, do the officers have a legitimate function in arresting the man? And if they can't arrest him, how far can they go in bringing him into arrest? Or do they, is the alternative, and I've never seen a case that says this, that they have to abandon the man? I understand. And I would again, I would again point to Roland versus Perry, which is the same sort of escalation of force against a person who's resisting. And in that case, the Fourth Circuit said that this use of force, the use of force that was effected to disable my client at the time was, should a jury find it, was unreasonable and would have been violative of the Fourth Amendment. Now, Mr. Lewis, I'm a little puzzled why you're not talking about the other six officers, the bystanders, or you're not relying on the fact that they could have come to the aid of the other officers who were having trouble? Well, certainly, Your Honor. I haven't heard that from you. Is that part of your argument today or no? Well, there were officers at the scene who were able There were six others, right? Six others, yes, Your Honor. At least six others. Six others that we know about. We expect that there were more. And along those lines, we are not in a position really to know what their involvement was other than their own affidavits. Part of that is because all of the radio traffic that took place between these officers on that day is gone. Usually that would be recorded. Usually we would be able to hear the officers speaking among themselves, communicating with each other, talking about whatever risks they perceived that they were facing. But that's gone. The reason that we're given that it's intense time, there was a radio antenna being relocated, and so five hours of traffic is missing. Your Honor, we feel like that summary judgment is inappropriate for the reasons that we've talked about, but including because a spoliation instruction in this case would allow a finder of fact to make inferences regarding what was on that tape that is missing and that there's, we would argue that we'd like to take more discovery as to what the reason for that missing radio traffic is. But yes, there were enough people there to take care of this situation. And again, we think there were enough people at the scene without hitting him in the face, without kneeing him in the head. We think that the four men who were on him were enough to effect the arrest. We think that it was gratuitous. Judge Boyle agreed with us that it was gratuitous. He used words like unnecessary, gratuitous, and disproportionate when he was talking about the second prong of the Saussure test, which is that is it clearly outside the bounds of the law. Judge Boyle said there's ample case precedent to show that unnecessary, gratuitous, and disproportionate use of force is clearly, is well known to be against the law and should be known by the officers who are out there. So yes, Your Honor, the existence of those other officers at the scene, including the sheriff himself, the fact that four officers were on him and didn't need to use the knee to the head, what our expert has characterized as deadly force. In this case, how did he get up and run away, run across the road into the field over there? Well, Your Honor, what happened there was the, and again, Judge Boyle found that this was not necessarily a refusal to comply. Judge Boyle found that he was turning around in the process of complying and was shot in the back with the taser. So he's shot in the back with the taser. A minute passes. A minute passes. We don't know what happens during that minute, but we do know that he was tased twice before his hands left the ground. He had his knees and his hands were on the ground, and he was tased twice more. So three tases. At that point, he took, again, that's 15 seconds within about a minute and 20 seconds, 15 seconds of 1,200 volts running through you. He took the lead wires out, and then he got sprayed in the face. Now, with respect to Mr. Wood's characterization that it didn't have any effect, I think there's evidence. Were there four people sitting on his back after all of this or before this? Your Honor, four people after that. After that. So at that point, when he had gotten sprayed in the face, that's when he ran into the field. That was just when he was dealing with Matthews, and that was even before Gilstrap had arrived. Isn't that correct? Yes, Your Honor. Okay. So he came back to the scene. He came back to the scene and was immobilized by his friend, and that's when... When he was tackled to the ground. Thank you, Your Honor. And it's at that point that Deputy Gilstrap came in and tased him three more times in fairly quick succession. And there is evidence based on the... Basically, what you're saying is that he wasn't restrained until Mr. Gilstrap arrived on the scene, and I guess he was tased three more times. Well, Your Honor, he was tased three more times by Deputy Gilstrap. Deputy Gilstrap got on top of him, and there were two officers... Was he restrained at any time before that? No, Your Honor. And we don't know why. We don't know why he wasn't restrained in the minute between the first and the second tase. We're not aware of why that happened or didn't happen. But it was at that point after those three tases that Deputies Gilstrap and Matthews were on him, and Deputy Babb came in and punched him in the face four or five times in a way that caused one by... That's a little misleading because he was still not yielding. They kept commanding him. They had to cuff him, and he was still not yielding to being cuffed. And they were trying to get his arm around to cuff him, and he was resisting and trying to get up. So they never had full control of him until they cuffed him. And when they cuffed him, then everybody receded. Your Honor, I would take some issue when we talk about viewing the evidence in the light most favorable to the plaintiff that he was trying to get up at that time. I don't believe he may have been resisting having the handcuffs put on him, but frankly, Your Honor, there were two grown men sitting on him, and I don't know whether one could make the judgment that he was trying to get up or not. Again, Mr. Shearer saw him, said he was not resisting and was not being violent, said he was, when I say not resisting, I want to be careful, he was not trying to get up. But then, again, Mr. Shearer turned away after the punches to the face because he felt it was, quote-unquote, a brutality and unnecessary. So, Your Honor, those are my comments, and we would ask you to affirm Judge Boyle's decision below and allow this case to move to trial. His decision applied to all of the officers? It did, Your Honor. Thank you. Thank you. Wood. Your Honor, just a few points in rebuttal. Counsel for the Capelli's referred to an ordinance or a regulation by the Lee County Sheriff's Office, and I think it mischaracterizes what it says. It says that people shall not hit people in the heads with objects. Nobody was hitting a head with an object, and that's not what it intends to talk about. A fist or some other open or soft non-object projectile, such as a fist, that's not what it's talking about. So I would take issue with that. I'd point out to the cases of Wilson v. Flynn, the Williams v. Sandell case that we put in our brief, a Sixth Circuit case, and the Karakoff case, again, from the Fourth Circuit. They all talk about people in situations similar like this, where you've got somebody who's incredibly strong, very, very difficult to control. In each of those cases, it took multiple officers. In the Williams case, it took them 38 tasers applications, numerous baton strikes, and other efforts at force to get control of the man. You have situations, unfortunately, where this happens. We've talked about it, and I've heard— Isn't the obvious alternative to have the other six officers on the scene getting the action and help out rather than strike somebody in the face and knee him in the face? A couple of points, Your Honor. First of all, these other six officers, two of them, it's undisputed, were never even there. Melton and Lloyd were never there. Okay, well, the other four, then. The others— The other officers on the scene. Most of the other officers arrived as or after Mr. Thomas was finally taken into custody. The only other officer that I think was there at any point in time during the actual struggle was Deputy Smith, and he testified. There were five people on him. They couldn't get control of him. There was nowhere for me to get a hold of him and grab him. You're saying it's not a jury question. I understand the jury argument, this is all the officers could do. And the jury might well say that's all they could do. They had to punch him in the face. But how isn't that a jury question? That's what's troubling me here. Not that they might ultimately get a verdict in their favor. They certainly, you know, might. But that it shouldn't be up to a jury to decide whether this was an unreasonable use or excessive use of force. I would point to the Wilson v. Flynn case, Your Honor, in which it's undisputed or the facts in light most favorable to the plaintiff that the plaintiff was struck, punched in the face numerous times to get control of him. And the court held in that case that not only was there wasn't any violation of the plaintiff's Fourth Amendment rights, there was no constitutional violation, without even going into the second prong of the qualified immunity analysis. And the same in Karakoff. The person died. This court found that there was no violation of his constitutional rights. There were numerous lacerations to his head and indications he'd been struck in the face. And so I would caution the court against going and, again, trying to look at this in hindsight and trying to go back and say, well, what should the officer have done? The counsel for the appellee said that, well, we don't know what happened during that minute between the first and second tasers of usages of Matthews. And I think it's dangerous to sit here and say, well, you, by yourself, faced with two men, because both of them are much larger than you, one of whom has already told you there's something the matter with him. He's mentally ill. Bruce was helping them out. Not at this point, Your Honor. I'm talking about the first taser. I'm at least addressing why there's been some contention that we should have or that Deputy Matthews by himself. I think the issue of the rub in this case centers around the final efforts to get the cuffs on him and the hitting his head and knee. And it seems to me that's the one you have to address. And the question, then, I suspect, is do we demand perfect conduct from police in these fast-moving circumstances, or if they cross the line, was it with the deliberate intent to violate known law? There has to be a deliberateness to violate a constitutional principle. And your argument, I gather, is these guys were reacting. They were reacting naturally as police officers would to bring somebody under control. We can't micromanage how that was carried out. That's correct, Your Honor. Unless there are any further questions. I would point out, though, with respect to the bystander liability defendants, it's undisputed two of them weren't even there. There were no findings whatsoever as to what constitutional violations there were to begin with with the first five defendants. And then there's no findings by the court as to what these six bystander liability defendants saw, whether they had an opportunity to prevent it and made a conscious choice not to do so. And this court can certainly go back when there's no facts by the district court to explain its rulings, to go back and look at the record, again, in the light most favorable to the plaintiff and see what it shows, to include undisputed facts, to include most of the testimony or all the testimony from Thomas. And I think in those instances, there's no evidence to show that any of these bystander liability defendants. I know that Thomas has pretty good recollection of what was going on. He just couldn't control the circumstances. I mean, he seems like he's an okay guy. He went afterwards and apologized to all the officers. I will say this, Your Honor. I mean, it's a small county. It's a rural county. A lot of these guys knew one another from high school. And there was communication after the fact. Too bad we had to get into litigation. I mean, the sheriff said, most of them will say, we like Wayne. Wayne's a friend of ours. But on that day, that wasn't Wayne. Clearly, he was suffering, and he knew he was suffering. Nobody disputes that in this case. There was something chemical in that chemical mix that sent him off. And I would just add, with what Your Honor said, with your comments, the officers did the very best that they could with the situation that they had. Lesser means didn't work. They did what they had to do to get him handcuffed and stuff. Dudley, in hindsight, probably could have accomplished the same act without the hittings. But the question is whether we can't go reconstruct and tell them how they have to do it. The question is whether they were going beyond the pale when they're trying to bring somebody under control. And you don't sort of play a chess game and figure out, now how am I going to bring them under control? You're just reacting. And the officers, they had a bunch of them there trying to get him under control. And the lack of gratuity is shown by the fact that as soon as they got cuffs on, there's no evidence that any officer struck, kicked, or punished the plaintiff in this case. As soon as they had the cuffs on, everybody then stopped. And that's supportive of the officers' attitude, I would think. Yes, Your Honor. I'm out of time. Okay. Thank you. We'll come down and greet counsel and proceed to the last case.
judges: Paul V. Niemeyer, Barbara Milano Keenan, Clyde H. Hamilton